EDWARD A. MULLEN, DEPUTY DIRECTOR OF THE DEPARTMENT OF PUBLIC SAFETY OF THE CITY OF HOBOKEN, AND THE MAYOR AND COUNCIL OF THE CITY OF HOBOKEN, PROSECUTORS, v. HONORABLE AUGUST ZIEGENER, JUDGE OF THE COURT OF COMMON PLEAS IN AND FOR THE COUNTY OF HUDSON, AND WILLIAM H. GILFERT, CLERK OF THE COURT OF COMMON PLEAS AFORESAID, AND GEORGE FITZPATRICK, RESPONDENTS.

Submitted October 1, 1946—Decided January 30, 1947.

Before Justices BODINE, PERSKIE and WACHENFELD.

For the prosecutors, *John J. Fallon*.

For the respondents, *Rothbard, Harris & Oxfeld* (*Emil Oxfeld*, of counsel).

The opinion of the court was delivered by

PERSKIE, J. The question for decision is whether the reversal by the Hudson County Court of Common Pleas of the dismissal of George Fitzpatrick from the police department of the City of Hoboken is proper.

George Fitzpatrick, a patrolman of the police department of the City of Hoboken, was convicted, by the Deputy Commissioner of Public Safety (*R. S.* 40:72–9), of having violated certain of the rules and regulations governing the conduct of members of the police department, as more particularly specified in each of the two separate complaints which had been filed against him. He appealed to the Hudson County Court of Common Pleas. *R. S.* 40:47–10. That court, pursuant to the last cited statute, re-tried the charges *de novo*.

It reversed the convictions and restored Fitzpatrick to his position as patrolman with back pay from May 12th, 1945, to the date of his restoration; and it entered an order on October 23d, 1945, accordingly. To review the order so entered, prosecutors were allowed a writ of *certiorari*. Pursuant to stipulation between counsel of the respective parties, approved by Chief Justice Case, the two separate complaints involved in the cause were consolidated for the purpose of hearing and argument before this court.

Our study of the competent proofs and the law applicable thereto (compare for analogy, *Friese* v. *Nagle Packing Co.,* 110 *N. J. L.* 588; 166 *Atl. Rep.* 307; *Helminsky* v. *Ford Motor Co.,* 111 *N. J. L.* 369, 373; 168 *Atl. Rep.* 420; *Cino* v. *Driscoll,* 130 *N. J. L.* 535; 34 *Atl. Rep.* (*2d*) 6) to the end of reviewing them *de novo* (*R. S.* 2:81–8; *Mullen* v. *Ziegener,* 134 *N. J. L.* 207, 208; 46 *Atl. Rep.* (*2d*) 783), satisfies us that they amply support the result reached in the Hudson County Court of Common Pleas.

One of the complaints against Fitzpatrick grew out of what the judge, in the Pleas, characterized as the "Officer Gehm incident" and the other as the "Jersey Observer incident."

### THE PHILLIP GEHM INCIDENT.

The complaint relating to this incident was filed by a captain of the police department on May 3d or 4th of 1945. Broadly stated, it charged Fitzpatrick with willful disobedience to orders, neglect of duty, &c., on March 3d, 1945. The gravamen of these charges is that Fitzpatrick admitted knowledge, on March 3d, 1945, of the whereabouts of one Phillip Gehm, wanted on the charge of atrocious assault and battery, but contrary to instructions, failed to report that information to his superior officer. The hearing on this complaint before the Deputy Commissioner of Public Safety was held on May 11th, 1945.

Fitzpatrick admitted at all times that he had knowledge of the fact that a warrant was outstanding for Gehm's arrest but denied that he had any knowledge as to Gehm's where-

abouts, or that he acknowledged to any one that he had such knowledge. What Fitzpatrick did testify to was that he concluded working on March 3d, 1945, at 4:00 P. M. He was alone in his home. He went to sleep and about 6:30 P. M., was awakened by two men who came to his home. He was told by these men that his name was left at a hospital in Newark, New Jersey; that Patrolman Gehm was and had been in a state of coma for the past twelve hours; that he suffered a possible fracture of the skull; that he needed blood and that Fitzpatrick "should stand by." Fitzpatrick further testified that he became excited, and thus failed to ask the names of the two men who were strangers to him, and who refused to give him the name of the hospital which housed Gehm. Fitzpatrick further testified that he reported orally this incident to his lieutenant who derided his report in a vulgar manner. The lieutenant denied that Fitzpatrick made any report to him. An investigation made by the police department of the City of Newark, at the request of the police department of the City of Hoboken, failed to disclose that Gehm was a patient in any one of the hospitals in Newark. Fitzpatrick's status as a patrolman remained undisturbed from the date of this incident (March 3d, 1945) until May 10th, 1945, when he was suspended by reason of having further allegedly violated departmental rules and regulations. This brings us to the second complaint.

### The Jersey Observer Incident.

The complaint in this instance was made on May 12th, 1945, by another captain of the police department. It would serve no useful purpose to detail the facts upon which the alleged violations are based. It should suffice to observe that they grew out of Fitzpatrick's refusal to answer certain questions posed to him by a deputy chief when he was examined on the afternoon of May 10th, 1945, the day prior to his trial on the first complaint, concerning the subject-matters contained in two letters which Fitzpatrick had written in his capacity as president of the Hoboken Local No. 2 of the Patrolmen's Benevolent Association, hereafter referred to as

P. B. A. One letter (May 2d, 1945) was addressed to the editor of the *Jersey Observer*. In this letter Fitzpatrick gave his version of the cause for the resignation of Patrolman Albert Bogert. That version was that Fitzpatrick was told by Bogert that he resigned because of his inability to get along on his wages and not, as it had been published in the *Jersey Observer*, that he resigned because of the actions of the P. B. A. generally and those of Fitzpatrick in particular. Fitzpatrick further stated that he was told by Bogert that he had written a short resignation in which he did not blame Fitzpatrick personally. The *Jersey Observer* published that letter and editorial comment based thereon, on May 3d, 1945.

The second letter (May 2d, 1945) was addressed to the president of the State P. B. A. and inclosed was a copy of the publication of the first letter. Fitzpatrick sought to explain why patrolmen were resigning from the Local. He stated instances of discrimination in imposing penalties for the violation of departmental rules and regulations. He pointed out, in effect, that those who were "in" with those in power, and those who belonged to the families of those in power, were not punished but those who did not occupy such a status were punished. He further pointed out that there was a plan to rid the Local of its present officers and to elect officers favorable to the administration, and that all means were being used to accomplish that result. He asked for the opportunity to lay these circumstances before the state delegates attending the next meeting of the State Association. The *Jersey Observer* published this letter and editorial comment based on this letter, on May 7th, 1945. The letters and editorials are in evidence. Fitzpatrick offered no defense before the Deputy Commissioner, on advice of counsel, because the Deputy Commissioner would not disqualify himself on the asserted grounds of prejudice, bias, &c. In the Pleas Fitzpatrick did testify. He produced corroboration as to his version of why Bogert resigned. Fitzpatrick further testified that he answered all questions posed to him by the Deputy Chief up to the point where he felt he was entitled to counsel. Thereafter he refused to answer further questions. He explained that his refusal was based on fear of

the resultant consequences if he truthfully answered further questions in the absence of counsel. And although he promised to send a copy of the second letter to the Deputy Chief, he changed his mind after he had been suspended and stripped of his indicia and equipment as a patrolman.

The competent proofs impel the conclusion that the governing officials were determined to rid themselves of Fitzpatrick and to gain control of the Local P. B. A., of which he was president. The following is a brief statement of the proofs of the action taken against Fitzpatrick to accomplish the stated result.

Fitzpatrick complained in behalf of his fellow officers about the type of uniform supplied the men, uniforms which the men described as sweating them in the summer and freezing them in winter. He was told that when he got his job he did "not care what in the * * * he wore, and if he didn't keep his * * * mouth shut, he would go back on the W. P. A." Fitzpatrick was assigned the post which was known as "the punishment post for all patrolmen." His usual one-half hour lunch period—enjoyed by all patrolmen—was denied him; he was told that he could leave his post only for "personal necessity;" he did partake of a sandwich and container of coffee brought to him by a fellow officer but was obliged to do so in the lavatory of the police headquarters; he could not stand the stench so ate while he was directing traffic; he was finally ordered to eat his lunch in the patrolmen's room at headquarters, he was the only man ever ordered so to do; he was denied a Christmas bonus; and he was told if he spoke to any one, not on police business, while on duty, he would "be broken." Fitzpatrick, pursuant to a general practice, was allowed pay because of illness. After he became president of the Local he underwent a minor throat operation as a result of which he did not work for about a week. He was denied pay for that period.

Fitzpatrick was invited by his captain—who had filed the first charges against him—to come to the mayor's office and if "he [Fitzpatrick] kept his mouth shut" there was "a sergeant's job awaiting him." Fitzpatrick declined the invitation. He also declined, as did Patrolmen Gehm and Kiely,

the request to sign a release for a claim of back salary for which he and other patrolmen had sued the city. Coincidently or otherwise, the three, Fitzpatrick, Gehm and Kiely, were dismissed from the force.

Fitzpatrick became a member of the police force on January 1st, 1941. Prior to the complaints involved in this cause, no complaint was made against him. His record was clear. Obviously, his superiors did not regard the Gehm incident as requiring disciplinary punishment. They had knowledge of the alleged offense on March 3d, 1945, and neither suspended Fitzpatrick nor filed a complaint against him until May 4th, 1945. *Cf. Mullen* v. *Ziegener, supra.* Again, was it coincidental or otherwise that the first complaint against Fitzpatrick was filed on the day following the publication of May 3d, 1945, in the *Jersey Observer?* We do not think it was merely coincidental. The proofs fail properly to establish the guilt of Fitzpatrick as charged.

In fine, we hold that the competent proofs and the law applicable thereto amply support the results reached in the Pleas.

The writ is dismissed, with costs.